No. 23-1769

In the United States Court of Appeals for the
Seventh Circuit

PATRICK JONES, JR.
*Plaintiff-Appellant,*

v.

LAKE COUNTY SHERIFF'S OFFICE, ET AL.
*Defendant-Appellee*

*Appeal from The United States District Court for the
Northern District of Illinois
Case No: 1-20-cv-05798
The Honorable Judge Sharon J. Coleman*

PLAINTIFF-APPELLANT PATRICK
JONES, JR.'S REPLY BRIEF

Ruth I. Major
The Law Offices of Ruth I. Major, P.C.
77 W. Wacker Drive
Suite 4500
Chicago, Illinois 60601
(312) 893-7544
rmajor@major-law.com
*Attorney for the Plaintiff-Appellant,
Patrick Jones, Jr.*

**Oral Argument Requested**

# **TABLE OF CONTENTS**

I.   DUE PROCESS.................................................................................1

  A.  Defendants Concede that the Supreme Court has
      Established the Standard for Due Process Claims
      Based on Liberty Interests as "Seriously Impairs"
      Future Employment Opportunities, but Contends
      this Court has Rightfully Rejected the Standard................................1

  B.  Defendants Cite to Irrelevant Law that
      Fails to Address Plaintiff's Arguments that
      He Does Meet the "Virtually Impossible" Standard ........................3

  C.  *Townsend,* the Case Defendants Also
      Rely On, Establishes There are Two
      Situations that Exist for a Liberty Interest Claim...........................7

II.  DEFAMATION *PER SE*...................................................................8

  A.  Defendants Fail to Address How the
      False Statements Made in the Termination
      Letter are Tied to Verifiably False Facts......................................8

  B.  Defendants Acted with Malice and Are Not
      Subject to Qualified Immunity, Apparent by Their
      Failure to Explain How it Came to the Exact Opposite
      Conclusion of the Only Investigation Done in this Case...................14

III. IMMUNITY...................................................................................15

  A.  Plaintiff Never Waived His Argument that
      Defendant Oliver is Not Subject to Absolute Immunity...................15

  B.  Tort Immunity Act.......................................................................19

IV.  CONCLUSION..............................................................................20

# TABLE OF AUTHORITIES

**Cases**                                                                               **Page(s)**

*Bd. of Regents of State Colleges v. Roth*,
 408 U.S. 564 (1972)……………………………………………………………..3

*Blair v. Walker*,
 349 N.E.2d 385 (1976)………………………………………………15-16, 18

*Bradley v. Village of University Park, Illinois*,
 59 F.4th 887, 897 (7th Cir.2023)…………………………………………...17

*Clinton v. Jones*,
 520 U.S. 681 (1997)……………………………………………………………..17

*Crudup v. Barton*,
 No. 98 C 1498, 2002 WL 276285 (N.D. Ill. Feb. 27, 2002)………………………20

*Dupuy v. Samuels*,
 397 F.3d 493 (7th Cir. 2005)……………………………………………………..5

*Global Relief Fund, Inc. v. New York Times Co.*,
 390 F.3d 973 (7th Cir. 2004)………………………………………………...14

*Harlow v. Fitzgerald*,
 457 U.S. 800, 811 (1982)…………………………………………..…..16, 17, 18

*Hedrich v. Board of Regents of University of Wisconsin System*,
 274 F.3d 1174 (7th Cir. 2001)……………………………………..…..6-7

*Jane Doe-3 v. McLean Cnty. Unit Dist. No. 5 Bd. of Directors*,
 2012 IL 112479……………………………………………………………...19-20

*Kolegas v. Heftel Broadcasting Corp.*,
 154 Ill.2d 1, 14 (1992)……………………………………………………….10

*Milkovich v. Lorain Journal Co.*,
 497 U.S. 1 (1990)…………………………………………………....9, 10-11

*Mitchell v. Forsyth*,
 472 U.S. 511, 511 (1985)……………………………………..…..16-17, 18

*Nike, Inc. v. Just Did It Enterprises*,
 6 F.3d 1225 (7th Cir. 1993)……………………………………………..12

*Novoselsky v. Brown,*
    822 F.3d 342, 349 (7th Cir. 2016)………………………………………………………18

*Olivieri v. Rodriguez,*
    122 F.3d 406 (7th Cir. 1997)…………………………………...……………….5-6

*Ratliff v. City of Milwaukee,*
    795 F.2d 612 (7th Cir. 1986)…………………………………...……….3-4

*Smith v. Bd. of Educ. of Urbana Sch. Dist.,*
*No 116 of Champaign Cnty., Ill.,*
    708 F.2d 258 (7th Cir. 1983)…………………………...………………2-3

*Townsend v. Vallas,*
    256 F.3d 661 (7th Cir. 2001)…………………………………...…………...7-8

*Trejo v. Shoben,*
    319 F.3d 878 (7th Cir. 2003)……………………………...…...……………….6

*U.S. v. Lovett.*
    328 U.S. 303 (1946)……………………………...….…………………….2

## Statutes                                                      Page(s)

745 ILCS 10/2-201…………………………………………………………19-20

745 ILCS 10/2-202…………………………………………………….…20

745 ILCS 10/2-210…………………………………………………………19-20

## I. DUE PROCESS

Defendants misstate or ignore critical facts while entirely failing to address controlling authority contrary to their positions, a theme that permeates the entirety of their response. Rather than addressing the issues raised in Plaintiff's opening brief directly, Defendants' response brief seemingly attempts to obfuscate the issues with the obvious goal of creating confusion. However, this futile effort fails, serving only to further highlight the reasons the lower court's decision should be vacated and the case remanded for a jury trial so the factfinder can resolve the dispute.

### A. Defendants Concede that the Supreme Court has Established the Standard for Due Process Claims Based on Liberty Interests as "Seriously Impairs" Future Employment Opportunities, but Contends this Court has Rightfully Rejected the Standard

Defendants argue that the Seventh Circuit rejected the "seriously impaired" standard in favor of the "virtually impossible" standard, *i.e.,* essentially arguing that the Seventh Circuit has intentionally opted not to follow U.S. Supreme Courts precedent. Though Plaintiff argues that the "virtually impossible" standard does not align with Supreme Court precedent, unlike Defendants, he does not argue that it was an unintentional departure from the U.S. Supreme Court's controlling precedent. Rather, Plaintiff explained that Seventh Circuit jurisprudence addressing due process claims based on liberty interest deviated from the Supreme Court's standard for such claims, ceasing to require a showing by a plaintiff that their job prospects were "seriously impaired," and instead applying a heightened standard which requires the plaintiff to show that obtaining a new position was "virtually impossible." (Appellant's Br. at p. 15-19). In time, the virtually impossible standard,

in its application, evolved into an even more elevated standard which required a plaintiff to show that obtaining new employment was, essentially, "impossible" (rather than *virtually* impossible). In this case, for example, Plaintiff Jones received one job offer, from the county he has lived in his entire life, despite an aggressive job search lasting more than two years and spanning municipal and county law enforcement agencies in two different states. The lower court determined that because he received one job offer, he had failed to establish his due process claim, thereby applying the "virtually impossible" standard as an "impossible" standard.

Defendants' response incorrectly represents that Plaintiff did not introduce Supreme Court precedent supporting the "seriously impairs" standard. In fact, Plaintiff identified the Supreme Court case establishing the "seriously impaired" standard, specifically *U.S. v. Lovett*. 328 U.S. 303, 305-6 (1946); (Appellant's Br. at p. 16). In *Lovett,* the Supreme Court found plaintiffs met the seriously impaired standard when they were foreclosed from certain federal positions, even though not foreclosed from state jobs, positions in the federal armed services, or federal positions where they were again appointed by the President. *Id.* at 305. In other words, it was not virtually impossible to obtain employment but rather plaintiffs job opportunities were seriously impaired when they were foreclosed from obtaining or holding some jobs.

As explained in Appellant's opening brief, following *Lovett* stemmed a line of Seventh Circuit cases applying the "seriously impairs" standard until this Court's decision in *Smith v. Bd. of Educ. of Urbana Sch. Dist. No 116 of Champaign Cnty.,*

*Ill.*, the case where the "virtually impossible" standard first appeared. 708 F.2d 258, 265 (7th Cir. 1983). *Smith* cites to the *Roth* decision as support, but the *Roth* decision relies on *Lovett* and makes it clear that even foreclosing a "range" of opportunities satisfies the "seriously impairs" standard. *Bd. of Regents of State Colleges v. Roth*, 408 U.S. 564, 574 (1972) ("The Court has held, for example, that a State, in regulating eligibility for a type of professional employment, cannot foreclose a <u>range of opportunities</u> 'in a manner . . . that contravene(s) . . . Due Process,'…") (emphasis added). Thus, it is clear that the Supreme Court never intended the standard to be so high that very few, if any, can attain it. Rather than address the *Lovett* decision, Defendants simply ignore it.

After *Smith,* the Seventh Circuit applied the "virtually impossible" standard, based on *Smith*, and case law evolved to a point where application of this standard makes it virtually impossible for a plaintiff to succeed on such a claim despite sustaining serious impairment to their career. Defendants fail to address or refute any of these points. Instead, Defendants simply rely on post-*Smith* cases, arguing that since the Seventh Circuit has not "wavered" since *Smith, Smith* must be the correct standard. (Appellees' Br., p. 11). More cases following the wrong standard does make the wrong standard right. The Supreme Court's decisions establishing the standard should be followed.

## B. Defendants Cite to Irrelevant Law that Fails to Address Plaintiff's Arguments that He Does Meet the "Virtually Impossible" Standard

Plaintiff also argued that even *if* the virtually impossible standard were to be followed, Jones still meets that standard, as seen in *Ratliff v. City of Milwaukee*, a

case that follows a similar fact pattern to the case at hand. 795 F.2d 612, 625 (7th Cir. 1986). To reiterate, in *Ratliff,* the Seventh Circuit found that false statements regarding an officer lacking trustworthiness and integrity "were so critical of [his] abilities as a police officer that it would be virtually impossible for [him] to find new employment in law enforcement". *Id.* Jones also offered evidence from his vocational expert, who confirmed the impact such statements would have on a young recruit's career. Thus, Jones' claims and damages go beyond "some stigma." (Appellees' Br., p. 12). Defendants completely fail to address these arguments.

Instead, Defendants turn a blind eye to unfavorable parts of the record, ignore controlling authority, and fabricate or misstate facts. For example, Defendants state that "Plaintiff did not provide any evidence that the termination letter was publicly disseminated to prospective employers" and rely on the fact that the letter could not be disclosed without Jones' consent and waiver. (Appellees' Br., p. 13). <u>First</u>, this is simply false, as Defendants later acknowledge in their brief, as Jones had confirmation that his letter was disclosed by Defendants to at least two prospective employers, the Waukegan Police Department and the Des Plaines Police Department (Dckt. 74-7). Moreover, as addressed before the lower court, this claim completely ignores Defendants' own policies and the evidence in the record from Defendants' own employee. More specifically, Defendant Oliver testified that Defendant Lake County Sheriff's Office provides prospective employers personnel files of its former employees' personnel files, which would include the termination letter, and that he understood that a person who is interviewing for law enforcement agencies would

have to explain why they were terminated by the Lake County Sheriff's Office. (Dckt. 74-16 at 211:16-212:14).

Lastly, it is wholly incorrect that "Plaintiff has also admitted that it was not the publication of the termination letter that impacted his job search but his explanation of the termination." (Appellees' Br., p. 14). Rather, Jones was forced to disclose the reason for his termination because he was specifically asked for the reason by his prospective employers and he knew that Defendant Lake County Sheriff's Office would disclose the letter, *supra*. (Dckt. 74-2, ¶ 13). Thus, there exists evidence in the record past mere speculation that shows that Jones' termination letter was shown to at least one prospective employer, and that Jones knew Defendant Lake County Sheriff's Office would continue to do so, compelling his self-disclosure. (Dckt. 74-16 at 82:82:23-83:8, 87:11-88:17, 89:5-13, 211:16-212:24; Dckt. 74-2, ¶ 13; Dckt. 74-18 at 163:17-164:16). Moreover, the information was provided to others such as those working in the Lake County Sheriff's Office and others in the community such as the Merit Commission responsible for overseeing the Office. (Dckt 74-6, p. 3).

Second, Defendants' position highlights its lack of understanding of relevant law. When the disclosure by a former employer to a potential future employer is inevitable, self-publication meets the publication requirement. *Dupuy v. Samuels*, 397 F.3d 493, 510 (7th Cir. 2005). Thus, while Defendants cite to *Olivieri v. Rodriguez*, this case is wholly distinguishable as *Olivieri* was a case where it was unknown whether the false information was going to be disclosed to potential

employers. In contrast, here, Jones has confirmation that Defendants disclosed the termination letter to at least two potential employers, that he had to disclose his termination on every application following his termination and that almost every employer asked him about the circumstances surrounding his termination. 122 F.3d 406, 408-09 (7th Cir. 1997); (Dckt. 74-2, ¶ 13, Dckt. 74-18 at 163:17-164:16, 167:6-168:8, 170:4-6).

Defendants also rely on two cases they contend are similar to Jones' case, and supportive of their argument that Jones cannot meet the virtually impossible standard. Both of these cases are distinguishable. In *Trejo*, a university professor was terminated and then returned to his home state "shortly thereafter" where he obtained a supervisory position earning more money than he had earned while employed with defendant. *Trejo v. Shoben*, 319 F.3d 878, 889 (7th Cir. 2003). There was no evidence that the plaintiff in *Trejo* had any difficulty finding new employment or that his potential employers were ever notified on the allegations against him. In contrast, Jones applied for twenty-eight positions over more than two years and received just one job offer. (Dckt. 74-2, ¶¶ 11-13). His prospective employers were aware of the allegations against him. In *Trejo* it appears plaintiff had a 100% success rate; here Jones had a roughly 3% success rate and his employers were notified of the false accusations made against him. Similarly, in *Hedrich v. Board of Regents of University of Wisconsin System*, another case relied on by Defendants, the court found that rejection from seven out of seven faculty positions did not satisfy the standard, noting that it is not unusual for a professor who was denied tenure to fail to obtain

6

new employment after applying for just seven academic jobs. 274 F.3d 1174, 1184 (7th Cir. 2001). In other words, the court found it was the termination itself that impacted on plaintiff's inability to find a new position, not any defamatory statements made about plaintiff. Here, however, Jones was applying for open law enforcement positions at a time when there was a great demand for qualified candidates because many officers were retiring or leaving the profession in unprecedented numbers. (Dckt. 74-24, p. 10). In fact, while Defendants misstate the record again, specifically that Jones only provided evidence that one employer was provided the termination letter, as the truth is that Jones also received evidence from another law enforcement agency because he had been previously dismissed from public service "for good cause and/or violation of public trust." (Dckt. 74-7, p. 1). Moreover, Jones also testified that if he got an interview, he was questioned about his termination, forcing him to further disclose the details of these circumstances and leading the potential employers to not consider him for the position. ((Dckt. 74-18 at 167:6-168:8, 168:20-169:3). Thus, *Hedrich* is also wholly distinguishable and irrelevant to Jones' specific set of facts.

## C. *Townsend,* the Case Defendants Also Rely On, Establishes There are Two Situations that Exist for a Liberty Interest Claim

Defendants argue that there is no separate good name, reputation, honor or integrity standard. (Appellees' Brief, p. 16). However, the case Defendants themselves cite to, *Townsend,* actually supports Plaintiff's argument, not

Defendants[1]. *Townsend*, though misquoted by Defendants, acknowledges that there are two situations that implicate a liberty interest:

> The Court has emphasized that, to implicate a liberty interest, such charges of defamation must be coupled with the alteration of a legal status, such as the loss of an employment position. We have interpreted *Roth* to indicate that a liberty interest may be threatened in **two types of situations** when the government removes someone from an employment position: (1) the individual's good name, reputation, honor or integrity are at stake by such charges as immorality, dishonesty, alcoholism, disloyalty, Communism or subversive acts; **or** (2) the state imposes a stigma or other disability on the individual which forecloses other opportunities.

*Townsend v. Vallas*, 256 F.3d 661, 669 (7th Cir. 2001) (internal citations omitted) (emphasis added). Defendants do not acknowledge, let alone explain, this portion of *Townsend.* Instead, Defendants focus only on the portion of the decision that addresses the occupational liberty situation and then mistakenly argue that this is the only situation that establishes a due process violation based on liberty interest despite stating otherwise elsewhere in the same decision. Defendants are proven wrong by the very case they rely on.

## II.    DEFAMATION *PER SE*

### A. Defendants Fail to Address How the False Statements Made in the Termination Letter are Tied to Verifiably False Facts

Defendants attempt to cherry pick evidence and whittle the facts down to fit their narrative. However, in doing so, Defendants fail to address a majority of

---

[1] Defendants incorrectly state that Plaintiff cited only to *Ratliff* to support the argument that the lower court erred in failing to consider the injury to Jones' good name, reputation, honor and integrity by the public disclosure and publishing of the termination letter. In fact, Plaintiff also cited to *Townsend v. Vallas.* (Appellant's Br., p. 21).

Plaintiff's arguments and cases, most notably that the statements made in the termination letter were statements tied to verifiably true or false facts. To reiterate, Plaintiff argues that within the employment context, statements that one lied in the context of their employment or engaged in dishonest acts in the conduct of their employment constitute defamation *per se*, especially when such statements are tied to specific facts that are provided at the time. Instead of responding to this issue, Defendants essentially regurgitate their summary judgment briefings, attempting to move this Court's focus from the defamatory comments to the use of the terminology "study guide". Defendants provide purported facts and statements that they claim establish that Jones was not damaged by the use of the terminology and argue that what Jones knew about the study guide is immaterial to making a determination as to the defamatory nature of the statements in the termination letter. However, all of Defendants' arguments merely serve as a red herring and as an obvious attempt to obfuscate the issues. As the U.S. Supreme Court stated, "the destruction that defamatory falsehood can bring is, to be sure, often beyond the capacity of the law to redeem. Yet, imperfect though it is, an action for damages is the only hope for vindication or redress the law gives to a man whose reputation has been falsely dishonored." *Milkovich v. Lorain Journal Co.*, 497 U.S. 1, 22-23 (1990). Jones, a young police officer whose career is now forever tainted, should be given, at a minimum, the hope and vindication for being falsely dishonored.

To be abundantly clear, Jones' defamation claim is predicated around the statements made in the termination letter that accuse him of being dishonest and

lacking integrity, specifically statements that his "actions to distribute that document to other recruits under the guise as a 'study guide'" and his "response" to the investigation "fell short of the truthfulness and integrity" that are "essential to the core standard of values we hold ourselves accountable to in law enforcement". (Dckt. 74-6, p. 1). In other words, Defendants accused Jones of lying twice in the course of his employment as a law enforcement officer and confirmed that such conduct rendered Jones unfit for his profession, first to his fellow recruits when he referred to the document as a study guide and second to the training program when they investigated the matter. These statements are not framed as "opinions" but rather as facts that accuse Jones quite clearly of lying and cheating in his police academy program rendering him unfit to hold a position in law enforcement.

Moreover, even if Defendants had couched their statements as "opinions", which they did not, Illinois courts do not protect such statements when the underlying statements are tied to conduct which can be proven true or false, as here. *See, e.g., Kolegas v. Heftel Broadcasting Corp.*, 154 Ill.2d 1, 14, 16 (1992). This was established by the U.S. Supreme Court in *Milkovich v. Lorain J. Co.*, when it reversed the lower court's holding and found that statements made about plaintiff were actionable, despite being couched as an opinion. 497 U.S. at 18. More specifically, the Court wrote:

> If a speaker says, 'In my opinion John Jones is a liar,' he implies a knowledge of facts which lead to the conclusion that Jones told an untruth. Even if the speaker states the facts upon which he bases his opinion, if those facts are either incorrect or incomplete, or if his assessment of them is erroneous, the statement may still imply a false assertion of fact. Simply couching such statements in terms of opinion

does not dispel these implications; and the statement, 'In my opinion Jones is a liar,' can cause as much damage to reputation as the statement, 'Jones is a liar.'

*Id.* at 18–19. Here, as discussed above, the statements here are tied to specific conduct by Jones which Jones can prove he did not engage in. He did not have the answers to the state police exam. He never believed he had answers to the state police exam. He did not lie to the Police Training Institute – University of Illinois ("Illinois Training Academy") during the investigation. All of this was confirmed by the Illinois Training Academy officials, who are experienced and well-respected law enforcement officers, and who recommended in their investigative report that Jones remain in the program, a recommendation that was shared and discussed with Defendants.

Defendants also attempt to make an argument that the document was, in fact, a cheat sheet as the document had a "sordid history". This is a fact dispute that is not proper at summary judgment. Moreover, even if it was appropriate for the lower court to weigh evidence and enter findings of fact, Defendants' argument wholly ignores all of the relevant evidence that Plaintiff presented. While Defendants refer to the "sordid history" of the study guide, a look at the history actually shows that the Illinois Training and Standards Board seemingly did not take the document seriously in that it never even conducted an investigation itself when it was first discovered. (Dckt. 74-19 at 155:5-157). Moreover, as Plaintiff stated in his opening brief and before the lower court, the staff from the entity responsible for creating and policing the exam, the Illinois Law Enforcement Training and Standards Board ("Illinois Training Standards Board"), could not determine whether the questions were

actually from the test by simply reviewing the document. Rather, the Illinois Training Standards Board had to compare the guide to the actual test to make the determination. Defendants never explain how Plaintiff, a recruit with no experience in law enforcement, would have known the document he received from his girlfriend which was presented as a "study guide" was in fact the questions and perhaps answers from the state exam if the Illinois Training Standards Board did not even know—and it wrote the test. Further, the Illinois Training Academy interviewed those involved and believed that there was no intent to cheat or to secretly use the guide to cheat. This issue is addressed at length in Plaintiff's opening brief. (Appellant's Br., p. 6-7). At bottom, all of the evidence in this case established that Plaintiff received a document that he shared with others believing it was a study guide and as a result was recklessly or intentionally defamed by Defendants who had no obligation to do so.

Defendants make much of the lower court's comments about how a reasonable jury would "likely" determine the document at issue was a "cheat sheet" which the lower court defines as "a sheet containing information (such as test answers) used secretly for cheating." (Dckt. 88, p. 2, n. 1). At summary judgment a trial court should not weigh evidence which is exactly what this finding is.  *See Nike, Inc. v. Just Did It Enterprises*, 6 F.3d 1225, 1233 (7th Cir. 1993) (stating that the lower "court erred in granting summary judgment to the plaintiff [Nike]" when it found that "Mike", a company who made very similar products to Nike, "**likely** confuses consumers. Although district courts are expert in finding facts, at the summary judgment stage

disputed facts must be reserved for the jury." (emphasis added). Indeed, whether the document was a "cheat sheet" or a study guide that had some prior exam questions included (for example, as Bar exam study guides have) was a disputed fact and all of the evidence in fact supported Jones' position that it was not a "cheat sheet," and that even if it was, Jones did not know it was. Jones received the study guide from his girlfriend who was a police officer, she told him it was a study guide, it was sloppily put together and had more questions not on the last state police exam than actually on it. Even the state officials who reviewed the document could not determine whether it was a "cheat sheet" without comparing it to the actual state exam questions, an opportunity Jones never had. If the professionals who are responsible for creating the state police exam do not even know if the document Jones had contained state exam questions how could a police academy recruit know? He had never seen the exam before. Moreover, Jones did not "secretly" use the document. He told several of his co-trainees—people he had just met that day—that he had a study guide that might help them study. Defendants can argue that one person out of all of the witnesses *may* have believed Jones said, "test answers," but not only did Defendants fail to even interview that person before making the defamatory statements about Plaintiff, or even depose that witness or offer her affidavit in this case, but had they done so it would still be a fact dispute reserved solely for the jury. Defendants' reliance on the lower court's finding of fact on the study guide is misplaced and improper for a myriad of reasons as discussed.

13

Defendants attempt to remedy their shortcomings by arguing that "Plaintiff also did not address the applicable law in Illinois—that a defendant need only show that a statement is substantially true." (Appellees' Br., p. 21). They believe that if they show that *other* statements made—statements that are not the subject of the defamation claim—are true, then the false and damaging statements are somehow equalized and not actionable as defamation. That is not the law. Only when the statements that are the subject of the defamation action are substantially true does defendant prevail. Here, the statements about Jones that are the subject of this lawsuit are completely false. Jones was not dishonest, he didn't secretly try to cheat, he didn't know he had answers to an exam that were prohibited, and he did not lie in response to the investigation into the matter.

Interestingly, even Defendants themselves do not seem to entirely agree with the district court's analysis of the defamation issue, as they fail to cite to the lower court's primary case, *Global Relief Fund, Inc. v. New York Times Co.,* in their appellate response brief (and never cited to the decision in their briefs before the lower court). 390 F.3d 973, 982 (7th Cir. 2004). Sometimes, silence is the loudest answer.

## B. Defendants Acted with Malice and Are Not Subject to Qualified Immunity, Apparent by Their Failure to Explain How it Came to the Exact Opposite Conclusion of the Only Investigation Done in this Case

Defendants acted with malice when they intentionally published these statements with reckless disregard. Defendants never conducted their own investigation though they could have. Instead, they relied on the investigation by the Illinois Training Academy, but then completely disregarded the Illinois Training

Academy's finding that that Jones did not engage in wrongful conduct. To this day, Defendants are still unable to explain why they would reject the findings of those experienced law enforcement officials who actually investigated the matter while at the same time refusing to conduct their own investigation. Given Defendants' woefully insufficient response to the arguments brought forth in the opening brief, as well as Plaintiff's arguments made in the opening brief, Defendants cannot escape liability for their intentional conduct by running for cover under the doctrine of qualified immunity and this Court should reverse the district court's judgment on Jones' defamation claim.

## III.    IMMUNITY[2]

### A.  Plaintiff Never Waived His Argument that Defendant Oliver is Not Subject to Absolute Immunity

Defendants make the argument that Plaintiff waived his absolute immunity argument because it claims he "does not identify any error in analysis or address the Illinois law the district court relied on in making this decision." However, this is blatantly incorrect. Plaintiff raised and addressed that the lower court did not conduct the proper analysis as to whether the drafting of a termination letter was a core, unique responsibility of the Sheriff's Office as opposed to a generic-type administrative duty. (Appellant's Brief, p. 28). Illinois follows federal law in determining whether absolute immunity applies. *Blair v. Walker*, 349 N.E.2d 385, 387-88 (1976). As such an analysis is central to determine whether Defendant Oliver

---

[2] Qualified immunity is discussed within the defamation section and thus, is not repeated in this section of this brief.

is subject to absolute immunity, Plaintiff brought forth cases, including two U.S. Supreme Court cases, which provide controlling authority. In one case, *Harlow v. Fitzgerald*, the Supreme Court held that in a wrongful discharge claim brought by a former employee of the Department of Air Force, the public employees responsible for the discharge were not protected by absolute immunity. 457 U.S. 800, 811 (1982). The Court rejected plaintiff's request for a "blanket protection of absolute immunity as an incident of their offices as Presidential aides." *Id.* at 808. The Court explained that in determining what types of acts are protected by absolute immunity the nature of the office must be considered, where it is a legislative body then legislative activities are covered, the judiciary is protected from judicial activities, and prosecutors are protected for prosecutorial activities. *Id.* at 811. But none of these officials are protected from more routine activities that are not specific to the nature of their office. Rather, the Supreme Court found that the employee, "first must show that the responsibilities of his office embraced a function so sensitive as to require a total shield from liability" and "then must demonstrate that he was discharging the protected function when performing the act for which liability is asserted". *Id.* at 813.

In *Mitchell v. Forsyth*, the Supreme Court refused to apply absolute immunity to a Cabinet officer for alleged unlawful conduct in "carrying out his national security functions," explaining "[t]he performance of national security functions does not subject an official to the same risks of entanglement in vexatious litigation as does the carrying out of the judicial or 'quasi-judicial' tasks that have been the primary well-springs of absolute immunities.". 472 U.S. 511, 511 (1985). More specifically, the

Supreme Court explained that even the President's absolute immunity is "derive[d] in principal part from factors unique to his constitutional responsibilities and station." *Harlow*, 457 U.S. at 811; *see similarly Mitchell*, 472 U.S. at 521 ("Mitchell's claim, then, must rest not on the Attorney General's position within the Executive Branch, but on the nature of the functions he was performing in this case"). In yet another case, *Clinton v. Jones,* the Supreme Court once again confirmed this when rejecting former President Clinton's argument that he was protected by absolute immunity for acts outside his "official acts". *Clinton v. Jones*, 520 U.S. 681, 695 (1997). The Supreme Court explained that when "defining the scope of an immunity for acts clearly taken *within* an official capacity, we have applied a functional approach. Frequently our decisions have held that an official's absolute immunity should extend **only** to acts in performance of **particular functions of his office**." *Id.* at 694 (emphasis added).

Moreover, as held in the very case Defendants cite to, *Bradley v. Village of University Park, Illinois*, there is no requirement that a plaintiff on appeal must address the exact same cases the district court relied on in issuing the decision under review and no precedent that failing to do so constitutes a "waiver" of the argument exists. 59 F.4th 887, 897 (7th Cir. 2023). Rather, in the opening brief, Plaintiff argued that the district court did not engage in the proper analysis to determine whether the activity in question was a core, unique responsibility of the Sheriff's office, as this is the only basis that would result in a grant of absolute immunity to Defendant Oliver. Thus, Plaintiff presented relevant cases, such as *Harlow, Mitchell* and *Auriemma*,

which explain the proper analysis, given that the Illinois Supreme Court relied on and followed decisions of the U.S. Supreme Court in determining the contours of absolute privilege for executive officials. *See Blair v. Walker*, 349 N.E.2d 385, 387-88 (1976). This is also apparent in another case Plaintiff cites to, *Novoselsky v. Brown*, in making the determination that Defendant Oliver was subject to absolute immunity. 822 F.3d 342, 349 (7th Cir. 2016). *Novoselsky* follows the Supreme Court precedent discussed above, specifically stating that the determination of whether absolute immunity applies "depends" on the "powers of this office". *Id.* at 350. In other words, absolute immunity does not extend to routine, administrative matters that are not tied to the special powers of the defendant office. Thus, in *Novoselsky*, the court found the defendant was subject to absolute immunity because it is the power of the Circuit Court Clerk's office to "respond to litigation filed against it." *Id.* This is vastly different from the case at hand where there exists no evidence nor case law that it is a core, unique responsibility of the Sherriff's Office to draft termination letters. In fact, Sheriff John Idleburg actually testified that only a notice of termination was required to provide to the Merit Commission, not a letter providing an explanation for the termination. (Dckt. 74-22 at 66:10-67:11). Similarly, Defendant Oliver testified that probationary employees could be terminated for no reason, meaning the termination letter was unnecessary. (Dckt 74-16 at 50:18-51:15). The basis for Plaintiff's appeal on this point is that neither Defendants nor the lower court undertook an analysis to determine how the drafting of a termination letter, not even required by any of Defendant Lake County Sheriff Office's policies, was a

core, unique responsibility to the Sheriff's Office to warrant absolute immunity. It was not and absolute immunity should not have been extended to this task.

## B. Tort Immunity Act

Defendants once again provide a response that cherry picks one case out of the six that Plaintiff cited to and moreover, fails to respond in any meaningful or compelling manner. Plaintiff argued that Defendant Oliver is also not subject to immunity under the Tort Immunity Act under 745 ILCS 10/2-201 because Defendant Oliver acted with willful and wanton conduct, pursuant to Section 2-210 which is incorporated by Section 2-201's language "[e]xcept as otherwise provided by Statute", discussed *supra*. Defendants seemingly argue that because one of the cases Plaintiff cites to*, Jane Doe-3 v. McLean Cnty. Unit Dist. No. 5 Bd. of Directors*, does not explicitly state that it is discussing section 2-201, more so focusing on section 2-210, Section 2-210 does not apply to Defendant Oliver. 2012 IL 112479, ¶ 44. However, this only highlights Defendants' lack of understanding of the Tort Immunity Act and statutory language interpretation. *Jane Doe-3,* while not explicitly stating that it is specifically discussing the relationship between Section 2-201 and 2-210, contains a discussion concerning Section 2-210 and the Tort Immunity Act as a whole. The court explains that:

> [T]he legislature may provide an express exception for willful and wanton conduct in one of two ways. It may do so positively, by stating expressly that the immunity provided does not extend to conduct that is willful or wanton. *See, e.g.,* 745 ILCS 10/2–202 (West 2010) ("A public employee is not liable for his act or omission in the execution or enforcement of any law unless such act or omission constitutes willful and wanton conduct."). Or, it may do so negatively, by stating expressly that the provided immunity applies only to conduct that is negligent.

> Such is the case with section 2–210, and this accounts for its inclusion in *Barnett*'s inventory of tort immunity provisions that unambiguously limit an immunity to cover only negligence.

*Id.* at ¶ 44. Defendants' statement also overlooks *Crudup v. Barton* (which Plaintiff cited to) which specifically cites to section 2-201 in stating "[t]he very next section of the Tort Immunity Act provides that "[a] public employee is not liable for his act or omission in the execution or enforcement of any law *unless* such act or omission constitutes willful and wanton conduct." 745 ILCS 10/2-202 (emphasis added). This more specific statutory provision controls". No. 98 C 1498, 2002 WL 276285, at *6 (N.D. Ill. Feb. 27, 2002). Moreover, Defendants provide no case law or any type of support for their contention that Section 2-201 does not incorporate other sections of the Tort Immunity Act, including Section 2-210.

## IV.    CONCLUSION

In conclusion, Defendants' attempts to obfuscate the issues amount to no more than frivolous arguments that do nothing to shed light on the heart of any of the three overarching issues. Rather, Defendants' failure to address Plaintiff's arguments and cases only serves to highlight that reversal of the lower court's dismissal of Plaintiff's claims is required in the interest of fairness and justness, to right the wrongs done to Patrick Jones, a young man who never deserved to have his career seriously damaged for making, at worst, an innocent mistake.

**Dated:** August 29, 2023                    Respectfully submitted,

                                             **PATRICK JONES, JR.**
                                             **Plaintiff-Appellant**

                                             /s/ Ruth I. Major
                                             By: One of His Attorneys

Ruth I. Major (ARDC No. 6205049)
**The Law Offices of Ruth I. Major, P.C.**
77 West Wacker Drive., Suite 4500
Chicago, Illinois 60601
Phone: (312) 893-7544
rmajor@major-law.com

21

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE SEVENTH CIRCUIT

### No. 23-1769

| | | |
|---|---|---|
| **PATRICK JONES, JR.,** | ) | |
| | ) | |
| **Plaintiff – Appellant,** | ) | **On Appeal from the United States District** |
| | ) | |
| **v.** | ) | **Court for the Northern District of Illinois,** |
| | ) | |
| **LAKE COUNTY SHERIFF'S OFFICE, ET AL.,** | ) | **Eastern Division,** |
| | ) | |
| | ) | **Case No: 1:20-cv-05798** |
| **Defendants – Appellee.** | ) | |
| | ) | |
| | ) | |

### <u>CERTIFICATE OF COMPLIANCE</u>

The undersigned counsel of record for Plaintiff-Appellant Patrick Jones, Jr. certifies pursuant to Fed. R. App. P. 32(a)(7)(C) that the Reply Brief of Plaintiffs-Appellants complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because the Brief contains 5,628 words including headings, footnotes, and quotations excluding the parts of the Brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii) and the type style requirements of Fed. R. App. P. 32(a)(6) because the Brief has been prepared in a proportionally spaced typeface using Microsoft Word, Century Schoolbook font in 12 point size, with footnotes in Century Schoolbook font 11 point size.

Respectfully submitted,

**Dated**: August 29, 2023          **PATRICK JONES, JR.**

/s/ Ruth I. Major
One of His Attorneys

Ruth I. Major (ARDC No. 6205049)
The Law Offices of Ruth I. Major P.C.
77 West Wacker Drive, Suite 4500
Chicago, Illinois 60601
Phone: (312) 893-7544
rmajor@major-law.com

## **CERTIFICATE OF SERVICE**

I certify that on August 29, 2023, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Seventh Circuit by using the CM/ECF system. I certify that all participants in this case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

Beth Prager
Eric F. Rinehart
Lake County State's Attorney's Office
18 N. County St.
Waukegan, IL 60085
(847) 377-3050
bprager@lakecountyil.gov

/s/ Ruth I. Major
Attorney for Plaintiff-Appellant